FILED

2020 Dec-11  PM 04:03
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA

UNITED STATES OF AMERICA

V.

JAMIE LEANN BEAM

Case No. 4:17-cr-00463-MHH-GMB-1

**ORDER ON MOTION FOR SENTENCE REDUCTION UNDER 18 U.S.C. § 3582(c)(1)(A)**

(COMPASSIONATE RELEASE)

## <u>MEMORANDUM OPINON AND ORDER</u>

Jamie Beam has filed a motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A) based on serious health concerns relating to the COVID-19 pandemic. (Doc. 227).  Ms. Beam is serving a 168-month sentence for drug crimes.  To evaluate Ms. Beam's motion, by way of background, we first describe Ms. Beam's trial court proceedings, Ms. Beam's sentence, and Ms. Beam's administrative effort to obtain compassionate release.  Then, we review the standards that govern motions for compassionate release and the impact of the current pandemic on incarceration.  Next, we consider Ms. Beam's health conditions and the extent to which those conditions make Ms. Beam vulnerable to serious outcomes if she should contract COVID-19.  Finally, we evaluate Ms. Beam's request for compassionate release,

1

applying the legal standards that govern these motions to determine whether Ms. Beam qualifies for conversion of her prison term to a special term of supervised release.

## I.

Ms. Beam was arrested on federal drug crime charges on November 8, 2017. (Doc. 159, p. 2). On March 22, 2018, Ms. Beam pleaded guilty to possession with intent to distribute methamphetamine and unlawful distribution of methamphetamine. There is a discrepancy between the description of the specific charges in Ms. Beam's plea agreement and in the discussion of charges during her plea hearing, on the one hand, and, on the other hand, in the description of the charges against her in the indictment, presentence investigation report, and judgment in this case. In the indictment, Ms. Beam was charged in three counts as follows: "conspir[acy] . . . to distribute and possess with intent to distribute 50 grams or more of methamphetamine," "distribut[ion of] 50 grams or more of methamphetamine," and "possess[ion] with intent to distribute 5 grams or more of methamphetamine." (Doc. 1, pp. 2–5).

In the plea agreement, the offenses concerning Ms. Beam are listed as: "Conspiracy to Distribute and Possession with Intent to Distribute More than 5 grams of Methamphetamine," "Possession with Intent to Distribute More than 50 grams of Methamphetamine," and "Possession with Intent to Distribute More than

50 grams of Methamphetamine." (Doc. 94, pp. 1–3).[1] Relying on the plea

agreement, during Ms. Beam's change of plea hearing, the Court stated:

> You have indicated that you want to plead guilty to Counts 1, 2, and 7
> of the indictment. In Counts 1 and 2 of the indictment, you're charged
> with the crime of conspiracy to distribute and possess with intent to
> distribute more than 5 grams of methamphetamine in violation of 21
> U.S. Code, Sections 846, 841(a)(1), and 841(b)(1)(A) and the crime of
> possession with intent to distribute more than 50 grams of
> methamphetamine in violation of 21 U.S. Code, Sections 841(a)(1) and
> 841(b)(1)(A).
>
> With respect to Count 7, in Count 7, you are charged with the crime of
> possession with intent to distribute more than 50 grams of
> methamphetamine. That's a violation of 21 U.S. Code, Sections
> 841(a)(1) and 841(b)(1)(B).

(Doc. 214, pp. 5–7). Though the Court perpetuated the mistaken information that

Ms. Beam was charged in Count 1 with respect to 5 grams of methamphetamine

rather than 50 grams, the Court accurately explained the sentence Ms. Beam faced

under Counts 1, 2, and 7. The Court stated that under Counts 1 and 2, the mandatory

minimum sentence was not less than 20 years and that the maximum sentence was

life, the supervised release period was at least 10 years, and the term of imprisonment

on Count 7 was be a minimum of 10 years and a maximum term of life. (Doc. 214,

p. 7). In the judgement, the offenses are listed as: "Conspiracy to Distribute and

Possess with Intent to Distribute 50 Grams or More of Methamphetamine,"

"Unlawful Distribution of 50 Grams or More of Methamphetamine," and

---

[1] The United States Code sections are correct in the plea agreement; they track the code sections
in the indictment. (*Compare* Doc. 1, pp. 1, 2, 4 and Doc. 94, pp. 1–3).

"Possession with Intent to Distribute 5 Grams or More of Methamphetamine." (Doc. 162, p. 1).[2]

On August 10, 2018, the Court sentenced Ms. Beam to 168 months in prison. (Doc. 162, p. 2). Ms. Beam is imprisoned at FCI Aliceville in Alabama, which houses 1,278 inmates. FCI ALICEVILLE, FEDERAL BUREAU OF PRISONS, https://www.bop.gov/locations/institutions/ali/ (last visited Dec. 2, 2020). Her current projected release date is August 16, 2030. Ms. Beam asserts that on May 15, 2020, she filed a BP-9 form with the warden of FCI Aliceville to request compassionate release. (Doc. 227, p. 5). She contends that her counselor returned the form to her and told her that she first had to make an informal complaint on regular paper before filing the BP-9. (Doc. 227, p. 5). On July 1, 2020, Ms. Beam made a second request for compassionate release to the warden on regular paper as instructed by her counselor, but she has not received a response. (Doc. 227, p. 5).

---

[2] In addition to her motion for compassionate release, Ms. Beam has filed a motion under 28 U.S.C. § 2255, which, liberally construed, raises a challenge to the knowing and voluntary nature of her plea. *See Beam v. United States of America*, 4:19-cv-08023-MHH. This order addresses only Ms. Beam's motion for compassionate release, but the Court notes that in her § 2255 motion, Ms. Beam argues that her counsel "failed to adequately communicate the law as it applied to [her] case and [her] attorney failed to consult with [her] regarding key strategy decisions. [Ms. Beam's] plea was not 'knowing and voluntary.'" (Doc. 1, p. 14).

4

## II.

Ms. Beam argues that her medical conditions "place her at increased risk for severe health consequences and death if she contracts COVID-19," creating extraordinary and compelling circumstances that warrant a modification of her sentence. (Doc. 227, p. 1). Under 18 U.S.C. § 3582(b), a judgment of conviction that includes a sentence of imprisonment "constitutes a final judgment and may not be modified by a district court except in limited circumstances." *Dillon v. United States*, 560 U.S. 817, 824 (2010) (internal quotations omitted). Compassionate release is one such circumstance. Under 18 U.S.C. § 3582(c)(1)(A)(i), the provision that governs motions for compassionate release, a district court:

> may not modify a term of imprisonment once it has been imposed except that ... the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that ... extraordinary and compelling reasons warrant such a reduction ... and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]

18 U.S.C. § 3582(c)(1)(A)(i). So, to achieve relief under § 3582(c)(1)(A)(i), a federal prisoner must exhaust her administrative remedies and demonstrate that

extraordinary and compelling reasons warrant a release, a sentence modification is consistent with the policy supporting compassionate release, and release is consistent with the sentencing factors identified in 18 U.S.C. § 3553(a).

The United States believes that Ms. Beam has exhausted her administrative remedies.  (Doc. 233, p. 1).  The Court agrees; Ms. Beam has submitted to the warden at FCI Aliceville both a formal and an informal request for release, and she has not received a response.  Therefore, the Court must consider whether Ms. Beam's medical conditions constitute an extraordinary and compelling reason for a reduction in her sentence.  Congress has not identified specific circumstances that rise to the level of "extraordinary and compelling" reasons for a sentence reduction, but U.S.S.G. § 1B1.13 cmt. n.1., the United States Sentencing Commission's policy statement relating to sentence reductions, sheds light on the issue.

The Commission has indicated that "a medical condition of the defendant [that] substantially reduces his ability to provide self-care in prison, (B) the advanced age of the defendant, and (C) the defendant's family circumstances" may constitute extraordinary and compelling reasons for a sentence reduction.  *United States v. McCall*, 465 F. Supp. 3d 1201, 1203 (M.D. Ala. 2020).  The Commission also recognizes "a 'catchall' provision where the Director of the BOP finds [that] 'other reasons' exist that are 'extraordinary and compelling.' United States Sentencing

Commission Guidelines Manual § 1B1.13 cmt. n.1(D)." *McCall*, 465 F. Supp. 3d at 1203.  According to the Commission, before reducing a sentence, a district court must find that "extraordinary and compelling reasons warrant the reduction" and that "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." U.S.S.G. § 1B1.13.[3]

Ms. Beam argues that the spread of COVID-19 in prisons, the mismanagement of prison outbreaks by the Bureau of Prisons, and the inability to socially distance at FCI Aliceville, in combination with her underlying medical conditions present extraordinary and compelling reasons justifying her release from prison.  (Docs. 227, 234).  COVID-19 is "a novel severe acute respiratory illness" for which "there is no known cure, no effective treatment, and no vaccine." *South Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613 (2020) (Roberts, C.J., concurring in denial of application for injunctive relief).  "Because people may be infected but asymptomatic, they may unwittingly infect others." *South Bay United Pentecostal Church*, 140 S. Ct. at 1613 (Roberts, C.J., concurring).  The pandemic is now nearly one year old, and it "remains extraordinarily serious and deadly."

---

[3] There is some debate about § 1B1.13's application to motions for compassionate release filed by a person other than the BOP.  The Court looks to § 1B1.13 for guidance even if the guideline is not directly applicable to Ms. Beam's motion for compassionate release. *McCall*, 464 F. Supp. 3d at 1203 ("[T]his policy guidance has not been updated since the passage of the First Step Act in December 2018, Pub. L. No. 115-391. This court joins many others around the country in finding that, with regard to any inconsistency between the statute and the policy statement, the policy statement serves as guidance, but does not limit the court's authority.").

*Roman Catholic Diocese of Brooklyn v. Cuomo*, --- S. Ct. ---, 2020 WL 6948354, at

*8 (Nov. 25, 2020) (Kavanaugh, J., concurring).  The United States has recorded

more than 15.4 million COVID-19 cases and more than 291,500 deaths since

January 21, 2020.  UNITED STATES COVID-19 CASES AND DEATHS BY STATE,

CENTERS FOR DISEASE CONTROL AND PREVENTION, https://covid.cdc.gov/covid-

data-tracker/#cases_casesinlast7days (last visited Dec. 11, 2020).  In Alabama,

where Ms. Beam is imprisoned, there are more than 284,000 confirmed COVID-19

cases and more than 4,000 deaths. ALABAMA, CORONAVIRUS RESOURCE CENTER,

JOHNS          HOPKINS          UNIVERSITY          OF          MEDICINE,

https://coronavirus.jhu.edu/region/us/alabama (last visited Dec. 11, 2020).

Over the past several weeks, as temperatures have fallen and people have

spent more time indoors, COVID-19 cases have increased at significant rates.  The

United States is averaging more than 2,000 deaths per day every day of December,

a weekly average of 182,663 new cases per day, and 101,276 hospitalizations (a

record number).  Noah Higgins-Dunn, *Covid is Killing More than 2,000 People a

Day in the U.S. as Infections and Hospitalizations Hit Records*, CNBC, Dec. 5, 2020,

https://www.cnbc.com/2020/12/05/covid-is-killing-more-than-2000-people-a-day-

in-the-us-as-infections-surge.html.  On Wednesday, December 9, more than 3,000

Americans died from COVID-19.  Heather Hollingsworth & Marion Renault, *One-

Day US Deaths Top 3,000, More than D-Day or 9/11*, ASSOCIATED PRESS, Dec. 11,

2020,                https://apnews.com/article/public-health-new-york-new-york-city-coronavirus-pandemic-a203294d021661100b57ddaeaa08bda9.        Dr.   Robert Redfield, Director of the Centers for Disease Control and Prevention, recently said that "the next three months are 'going to be the most difficult time in the public health history of this nation,'" and that the United States death toll could reach 450,000 by February 2021.  Antonia Noori Farzan et al, *Coronavirus Live Updates: U.S. Reports More Than 200,000 New Cases and 100,000 Hospitalizations for First Time*,                WASHINGTON                POST, https://www.washingtonpost.com/nation/2020/12/03/coronavirus-covid-live-updates-us/ (last visited Dec. 3, 2020).

As the United States Court of Appeals for the Eleventh Circuit has explained, "[i]t would be a colossal understatement to say that the COVID-19 pandemic has had far-reaching effects."  *Swain v. Junior*, 961 F.3d 1276, 1280 (11th Cir. 2020). The Court of Appeals recognized that COVID-19 "poses particularly acute challenges for the administration of the country's jails and prisons.  Because incarcerated inmates are necessarily confined in close quarters, a contagious virus represents a grave health risk to them—and graver still to those who have underlying conditions that render them medically vulnerable."   *Swain*, 961 F.3d at 1280. Professor Kovarsky summed up the prison COVID-19 situation this way:  "prisons present systemic risks because the health infrastructure is deplorable, social

distancing is impossible, and the prisoner community has heightened medical vulnerabilities. Those facilities [are] pandemic tinderboxes, and COVID [is] more than enough to kindle the blaze." Lee Kovarsky, *Pandemics, Risks, and Remedies*, 106 VA. L. REV. ONLINE 71, 97 (2020). "From the earliest days of the pandemic, it was clear that the novel coronavirus posed an outsized danger to the more than two million people locked inside America's prisons and jails . . . . By summer, infection rates in state and federal prisons dwarfed national rates by a ratio of 5.5 to 1, and, accounting for age, people in prison were dying at three times the rate of society as a whole." Sharon Dolovich, *Mass Incarceration, Meet COVID-19*, 11/16/2020 U. CHI. L. REV. ONLINE 4 (2020). As of December 11, 2020, 155 federal inmates and two Bureau of Prisons staff members have died from COVID-19, and over 8,800 inmates and staff have tested positive. COVID-19, FEDERAL BUREAU OF PRISONS, https://www.bop.gov/coronavirus (last visited Dec. 11, 2020).

A "single prisoner infection ultimately threaten[s] the entire institutional community." Lee Kovarsky, *Pandemics, Risks, and Remedies*, 106 VA. L. REV. ONLINE 71 (2020).[4] This is especially true when prisons do not test asymptomatic prisoners.[5] FCI Talladega, a BOP facility in Alabama, is a case in point. As of

---

[4] *See also Segars v. United States*, No. 16-20222-3, 2020 WL 3172734, at *3 (E.D. Mich. June 15, 2020) ("The prison's report of zero confirmed cases is more likely a result of a lack of testing than a lack of the virus' presence in the prison.").

[5] *See* Linda So & Grant Smith, *In Four U.S. State Prisons, Nearly 3,300 Inmates Test Positive for Coronavirus -- 96% Without Symptoms*, REUTERS (Apr. 25, 2020,

December 5, 2020, the facility reported that 19 prisoners and 19 staff members had COVID-19.      FACILITY-LEVEL      BOP      COVID-19      TRENDS, https://www.arcgis.com/apps/MapSeries/index.html?appid=a3e98be1aab94eadaaea a96ed176f418 (last visited Dec. 11, 2020).  As of December 10, 2020, BOP reports that 36 prisoners and 25 staff have tested positive for COVID-19.  COVID-19 CORONAVIRUS, FEDERAL BUREAU OF PRISONS,  https://www.bop.gov/coronavirus/ (last visited Dec. 11, 2020).

## III.

As noted, Ms. Beam is serving her sentence at FCI Aliceville.  That facility currently has three inmates and eight staff with confirmed cases of COVID-19; 47 inmates and 9 staff have recovered.  COVID-19 CORONAVIRUS, FEDERAL BUREAU OF PRISONS, https://www.bop.gov/coronavirus/ (last visited Dec. 11, 2020).  Ms. Beam is 43 years old.  (Doc. 227, p. 1; Doc. 159, p. 3).  She suffers from hypothyroidism, severe obesity, hypertension, and Type II Diabetes.  (Doc. 227, p. 1).[6]

---

https://www.reuters.com/article/us-health-coronavirus-prisons-testing-in/in-four-u-s-state-prisons-nearly-3300-inmates-test-positive-for-coronavirus-96-without-symptoms-idUSKCN2270RX); Dawson White, *Prisons Slammed with Coronavirus Cases – And Many Inmates Don't Have Symptoms*, MIAMI HERALD (Apr. 28, 2020, https://www.miamiherald.com/news/coronavirus/article242338956.html).

[6] In its response in opposition to Ms. Beam's motion for compassionate release, the United States "does not dispute that [Ms. Beam] has two medical conditions, obesity and type 2 diabetes, that place her at an increased risk for severe illness from Covid-19, and one condition, hypertension, that might place her at an increased risk for severe illness from Covid-19."  (Doc. 233, pp. 1–2).

With respect to obesity, at the time of her PSR interview, Ms. Beam was 5' 11" and weighed 285 pounds: her body mass index was 39.7 which is obese. (Doc. 159, p. 22, ¶ 105).[7]  In May 2020, Ms. Beam weighed 346 pounds, registering a BMI of 48.3. (Doc. 227, p. 11; Doc. 227-1, p. 77). According to Rush University Medical Center, a "normal" weight range for someone who is 5' 11" is between 136 and 178 pounds.  HOW MUCH SHOULD I WEIGH?, RUSH UNIVERSITY MEDICAL CENTER, https://www.rush.edu/health-wellness/quick-guides/what-is-a-healthy-weight  (last visited Dec. 2, 2020).

According to the CDC, severe obesity "increases your risk of severe illness from COVID-19." OVERWEIGHT, OBESITY AND SEVERE OBESITY, PEOPLE WITH CERTAIN MEDICAL CONDITIONS, CORONAVIRUS DISEASE, CENTERS FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited Dec. 2, 2020). The CDC lists obesity as an underlying medical condition putting patients "at higher risk for severe COVID-19 associated illness."  Hilda Razzaghi et al., *Estimated County-Level Prevalence of Selected Underlying Medical Conditions Associated*

---

For the reasons discussed below, the United States understates the threat that Ms. Beam faces from hypertension. The United States also has overlooked Ms. Beam's hypothyroidism and her overall health status.

[7] ADULT BMI CALCULATOR, CENTERS FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/healthyweight/assessing/bmi/adult_bmi/english_bmi_calculator/bmi_calcul ator.html (last visited Dec. 2, 2020).

*with Increased Risk for Severe COVID-19 Illness – United States, 2018*, Centers for Disease Control and Prevention, July 24, 2020, https://www.cdc.gov/mmwr/volumes/69/wr/mm6929a1.htm?s_cid=mm6929a1_w (listing obesity as risk factor for severe COVID-19 outcome).

Researchers report that "[a] growing body of evidence indicates that obesity is strongly and independently associated with adverse outcomes of COVID-19, including death." Sam M. Lockhart & Stephen O'Rahilly, *When Two Pandemics Meet: Why is Obesity Associated with Increased COVID-19 Mortality?*, MED (2020), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7323660/pdf/main.pdf; *see also* Sara Y. Tartof, et al., *Obesity and Mortality Among Patients Diagnosed with COVID-19: Results From an Integrated Health Care Organization*, ANNALS OF INTERNAL MEDICINE (2020), https://www.acpjournals.org/doi/pdf/10.7326/M20-3742 (concluding that "[o]besity plays a profound role in risk for death from COVID-19, particularly in . . . younger populations" and identifying severe obesity as "a target for early intervention.").

District courts in this circuit have concluded that obesity is a comorbidity justifying compassionate release because of the heightened risk COVID-19 poses to obese prisoners. *See, e.g.*, *United States v. Asher*, 467 F. Supp. 3d 1285, 1291 (N.D. Ga. 2020) (granting compassionate release because defendant was at "higher risk for getting and becoming seriously ill and dying from COVID-19 because of his medical

13

conditions" including obesity); *United States v. Howard*, --- F. Supp. 3d ---, 2020 WL 5644880, at *3 (M.D. Ala. Sept. 22, 2020) (granting compassionate release because obesity and other comorbidities "present[] 'extraordinary and compelling' reasons for release" particularly because "these chronic conditions substantially diminish his ability 'to provide self-care within the environment of a correctional facility . . . .").

In addition to being obese, Ms. Beam suffers from Type II Diabetes. (Doc. 227, p. 10; Doc. 227-1, p. 1; Doc. 233, p. 2). She developed diabetes after she entered prison. (Doc. 227-1, p. 57). "Early research show[ed] that diabetes patients . . . have [COVID-19] mortality rates that are more than twice as high as overall mortality rates." *United States v. Rodriguez*, 451 F. Supp. 3d 392, 394 (E.D. Pa. 2020). The CDC states that "[h]aving type 2 diabetes increases your risk of severe illness from COVID-19." DIABETES, PEOPLE WITH CERTAIN MEDICAL CONDITIONS, CORONAVIRUS DISEASE, CENTERS FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited Dec. 2, 2020). "People with diabetes tend to live in a chronic inflammatory state, setting them up for a more severe inflammatory response to Covid-19 that can culminate in a life-threatening cytokine storm." Elizabeth Cooney, *Why People with Diabetes are Being Hit so Hard by Covid-19*, STAT, Oct. 1, 2020, https://www.statnews.com/2020/10/01/why-people-with-

diabetes-are-being-hit-so-hard-by-covid-19/.  "People with type 2 diabetes also have more ACE2 receptors in many tissues, including those lining blood vessels . . . opening many more doors to Covid-19 invasion.  ACE2 is one receptor that the coronavirus's spike protein uses to gain entry into cells."  Elizabeth Cooney, *Why People with Diabetes are Being Hit so Hard by Covid-19*, STAT, Oct. 1, 2020, https://www.statnews.com/2020/10/01/why-people-with-diabetes-are-being-hit-so-hard-by-covid-19/.

Ms. Beam also suffers from hypertension, meaning high blood pressure. (Doc. 227, p. 1; Doc. 233, p. 2; Doc. 159, p. 23, ¶ 106).  Ms. Beam was first diagnosed with high blood pressure in 2003 and has used prescription Lisinopril to help manage the condition.  (Doc. 159, p. 23, ¶ 106).  "The latest evidence shows that people with uncontrolled or untreated high blood pressure may be at risk of getting severely ill with COVID-19."  William F. Marshall, III, *COVID-19 and High Blood Pressure: Am I at Risk?*, MAYO CLINIC, June 30, 2020, https://www.mayoclinic.org/diseases-conditions/coronavirus/expert-answers/coronavirus-high-blood-pressure/faq-20487663.  "The most prevalent comorbidity in patients hospitalized for COVID-19 was hypertension, which was also a risk factor for acute kidney injury in the [emergency room] and mortality in these patients . . . ."  Darlene Dobkowski, *Studies Find Hypertension Most Prevalent Comorbidity in Patients Hospitalized for COVID-19*, CARDIOLOGYTODAY, Sept. 10,

2020, https://www.healio.com/news/cardiology/20200910/hypertension-may-affect-outcomes-in-covid19.  The American Medical Association has explained that this "dangerous trend in hypertension" may leave patients "at increased risk for more severe outcomes if they acquire the SARS-CoV-2 infection."  Sara Berg, *Why BP Control Takes on Greater Importance During COVID-19*, AMERICAN MEDICAL ASSOCIATION, Nov. 17, 2020, https://www.ama-assn.org/delivering-care/hypertension/why-bp-control-takes-greater-importance-during-covid-19.

Courts have recognized that hypertension can be one underlying health condition that supports compassionate release.  *See, e.g.*, *United States v. Weems*, --- F. Supp. 3d ---, 2020 WL 4558381, at *5 (S.D. Fla. Aug. 7, 2020) (granting compassionate release when inmate had health conditions and "other elevating-risk health problems like hypertension."); *United States v. Feucht*, 462 F. Supp. 3d 1339 (S.D. Fla. 2020) (granting compassionate release to defendant with hypertension and other health conditions); *United States v. Bertrand*, --- F. Supp. 3d ---, 2020 WL 2179387 (N.D. Fla. Apr. 20, 2020) (same).

Ms. Beam's hypertension is serious and potentially fatal even in the absence of COVID-19.  Her medical records show that in October 2019, she visited the medical staff at FCI Aliceville twice within a few days because she was experiencing pain on the left side of her neck, jaw, and chest and numbness and swelling in her legs.  (Doc. 227-1, pp. 74, 77).  An initial EKG revealed that Ms. Beam was suffering

from bradycardia.   (Doc. 277-1, p. 75).[8]   In December 2019, the medical staff increased the medication that Ms. Beam is prescribed to treat her hypertension. (Doc. 277-1, p. 66).   On January 31, 2020, Ms. Beam was designated for chronic care because of her hypertension and diabetes.   (Doc. 277-1, pp. 71–72).   Medical staff order an EKG for her.   (Doc. 277-1, p. 71).

In February 2020, Ms. Beam presented to medical staff with an elevated TSH level.   TSH means thyroid-stimulating hormone.   "TSH normal values are 0.5 to 5.0 mIU/L."   WHAT ARE NORMAL THYROID HORMONE LEVELS?, UCLA HEALTH, https://www.uclahealth.org/endocrine-center/normal-thyroid-hormone-levels,   (last visited Dec. 11, 2020) .   In February 2020, Ms. Beam's thyroid level was 6.530 (Doc. 277-1, p. 73).   She was diagnosed with hypothyroidism and prescribed medication for treatment.   At the same visit, medical staff doubled Ms. Beam's prescription for metformin, a drug used to treat diabetes, because Ms. Beam's A1C level had increased.   (Doc. 277-1, pp. 74–76).

The CDC has explained that individuals with one or more risk factors, like Type II Diabetes, obesity, and hypertension, are most vulnerable to ICU admission.

---

[8]      BRADYCARDIA,          MAYO          CLINIC,          https://www.mayoclinic.org/diseases-conditions/bradycardia/symptoms-causes/syc-20355474#:~:text=Bradycardia%20is%20a%20slower%20than,rich%20blood%20to%20the%20body.;%20https://www.heart.org/en/health-topics/arrhythmia/about-arrhythmia/bradycardia--slow-heart-rate ("Bradycardia is a slower than normal heart rate.   The hearts of adults at rest usually beat between 60 and 100 times per minute.   If you have bradycardia . . . your heart beats fewer than 60 times a minute.   Bradycardia can be a serious problem if the heart doesn't pump enough oxygen-rich blood to the body.") (last visited Dec. 8, 2020).

*See Preliminary Estimates of the Prevalence of Selected Underlying Health Conditions Among Patients with Coronavirus Disease 2019 – United States, February 12–March 28, 2020*, CENTERS FOR DISEASE CONTROL AND PREVENTION, April 3, 2020, https://www.cdc.gov/mmwr/volumes/69/wr/mm6913e2.htm. According to a June 2020 paper, "patients with COVID-19 disease who have comorbidities, such as hypertension or diabetes mellitus, are more likely to develop a more severe course and progression of the disease." Adekunle Sanyaolu et al, *Comorbidity and its Impact on Patients with COVID-19*, SN COMPREHENSIVE CLINICAL MEDICINE, June 12, 2020, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7314621/pdf/42399_2020_Article _363.pdf. The researchers concluded that "COVID-19 patients with history of hypertension, obesity, chronic lung disease, diabetes, and cardiovascular disease have the worst prognosis and most often end up with deteriorating outcomes such as ARDS and pneumonia." Adekunle Sanyaolu et al, *Comorbidity and its Impact on Patients with COVID-19*, SN COMPREHENSIVE CLINICAL MEDICINE, June 12, 2020, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7314621/pdf/42399_2020_Article _363.pdf.

Ms. Beam's potential need for hospitalization if she contracts COVID-19 presents a challenge for her as an inmate at FCI Aliceville. Her medical records show that in 2019, when she needed medical treatment for hypertension, she was

sent to Pickens County Medical Center.  (Doc. 227-1, p. 46).  Pickens County Medical Center closed in March 2020.  *See* Alan Collins, *Rural Hospitals Being Strained by COVID-19 Patients*, WBRC, Nov. 17, 2020, https://www.wbrc.com/2020/11/17/rural-hospitals-being-strained-by-covid-patients/.  Residents of Pickens County who require medical treatment now must travel to Columbus, Mississippi or Tuscaloosa, Alabama for hospitalization.  *See* WVUA 23 Digital Desk, *Pickens County Deals With Coronavirus Complications*, Apr. 13, 2020, https://wvua23.com/pickens-county-deals-with-coronavirus-complications/.  According to Google Maps, a trip from FCI Aliceville to Columbus, Mississippi, without traffic, can take between 37 and 44 minutes; a trip from FCI Aliceville to Tuscaloosa takes about an hour.  First responders and medics have been feeling the strain of the Pickens County hospital closure, explaining that "ambulance[s] ha[ve] been working overtime . . . trying to take care of just the normal traffic, much less new traffic that has been generated by this virus."  WVUA 23 Digital Desk, *Pickens County Deals With Coronavirus Complications*, Apr. 13, 2020, https://wvua23.com/pickens-county-deals-with-coronavirus-complications/. The lack of medical facilities near FCI Aliceville present a serious threat to Ms. Beam should she require hospitalization or more serious treatment for COVID-19 or her other underlying health conditions.

19

Ms. Beam's options for medical treatment will improve significantly if she is released from prison.  Upon release, Ms. Beam plans to live with her husband in Gadsden, Alabama.  (Doc. 227, p. 2).  Gadsden Regional Medical Center and Riverview Regional Medical Center serve the Gadsden community.  Gadsden Regional Medical Center has a 346-bed facility and highly-rated programs in cardiology and emergency care.  GADSDEN REGIONAL MEDICAL CENTER, https://www.gadsdenregional.com/?utm_campaign=gmb-website&utm_medium=organic&utm_source=google (last visited Dec. 8, 2020).  Riverview Regional Medical Center has a 281-bed facility and in 2018 received the "Healthgrades 2018 Patient Safety Excellence Award, a designation that recognizes superior performance of hospitals that have prevented the occurrence of serious, potentially avoidable complications for patients during hospital stays."  *Riverview Regional Medical Center Receives Healthgrades 2018 Patient Safety Excellence Award*,                 Nov.                 15,                 2018, https://www.riverviewregional.com/news/2018/november/riverview-regional-medical-center-receives-healt/.

The Court concludes that Ms. Beam's status as a chronic care inmate with Type II diabetes, obesity, and hypertension makes her extremely vulnerable to severe outcomes, including death, if she should contract COVID-19.  Even though the current rate number of positive COVID-19 tests at FCI Aliceville is relatively

small, Ms. Beam's risk of contracting COVID-19 in prison is significant and the potential for exposure is growing as the rate of COVID-19 cases accelerates. Ms. Beam's significant vulnerability to a severe outcome if she contracts COVID-19 is an extraordinary and compelling circumstance that supports a modified sentence.

## IV.

A review of the sentencing factors 18 U.S.C. § 3553(a) supports a modification of Ms. Beam's sentence. The United States correctly points out that Ms. Beam was convicted for her role in "a significant drug conspiracy in which she sold methamphetamine and worked with her brother and another co-conspirator to procure large amounts of methamphetamine." (Doc. 233, p. 3). The United States argues that Ms. Beam's current sentence reflects "the seriousness of the offense and was imposed to afford adequate deterrence to criminal conduct." (Doc. 233, p. 3).

That is so, but the fact remains that Ms. Beam was convicted for conduct that occurred over a fairly short period of time. Although she was part of a drug conspiracy that lasted between 2014 and 2016, (Doc. 159, p. 8, ¶ 31), she was actively involved in the conspiracy for only a few months, (Doc. 159, pp. 10–11, ¶¶ 43, 44, 49). The PSR explains that Ms. Beam "monitored drug transactions, transported, and sold drugs . . . ." (Doc. 159, p. 8, ¶ 32; *see also* Doc. 159, p. 8, ¶ 36). After her arrest in October of 2015, Ms. Beam spent three years on pretrial

release which, she argues "is strong evidence that she is unlikely to reoffend and unlikely to pose a danger to the community as long as she continues in treatment for substance abuse." (Doc. 234, p. 1).[9] The Court agrees.

Though the seriousness of Ms. Beam's offense and the need for punishment and deterrence have not changed since the Court sentenced Ms. Beam, the law that sets the penalty for her crimes has changed. Shortly after the Court sentenced Ms. Beam, Congress adopted the First Step Act of 2018, Pub. L. No. 115-391. Under that legislation, Ms. Beam's prior felony conviction would not enhance her penalties, as it did at the time of sentencing. When the Court sentenced her in August 2018, Ms. Beam was subject to an enhanced mandatory minimum sentence of 20 years imprisonment under 21 U.S.C. § 841(b)(1)(A). At that time, the enhancement applied "to any 'prior conviction for a felony drug offense.'" (Doc. 227, p. 6) (quoting 21 U.S.C. § 841(b)(1)(A) (2017)). The First Step Act amended § 841(b)(1)(A), and now the drug offense enhancement applies only to a "prior conviction for a serious drug felony." 21 U.S.C. § 841(b)(1)(A). Ms. Beam argues that her previous drug conviction would not be a "serious drug felony" because she only received probation and today a "serious drug felony" requires, among other factors, that the offender "served a term of imprisonment of more than 12 months."

---

[9] Ms. Beam's alcohol and drug use both began at age eight. (Doc. 159, p. 23, ¶¶ 109–10). Her father provided her with alcohol when she was eight, and she first used marijuana when she was eight. (Doc. 159, p. 23, ¶¶ 109–10).

(Doc. 227, p. 6) (quoting 21 U.S.C. § 802(57)(A)).  If the Court sentenced Ms. Beam today, her statutory sentencing range would be 10 years to life imprisonment under 21 U.S.C. § 841(b)(1)(A).

In addition, under the First Step Act, if the Court were to sentence Ms. Beam today, she would qualify for safety valve relief.  Currently, under the safety valve, found at 18 U.S.C. § 3553(f), a district court "shall impose a sentence . . . without regard to any statutory minimum sentence" if an offender satisfies certain criteria. Relevant to Ms. Beam, the offender must not have: "(A) more than 4 criminal history points, excluding any criminal history points resulting from a 1-point offense, as determined under the sentencing guidelines; (B) a prior 3-point offense, as determined under the sentencing guidelines; and (C) a prior 2-point violent offense, as determined under the sentencing guidelines[.]"  18 U.S.C. § 3553(f)(1)(A-C). Before the First Step Act amendments, an offender "could not qualify for the safety valve if the defendant had 'more than 1 criminal history point.'"  (Doc. 227, p. 7) (quoting 18 U.S.C. § 3553(f) (2017)).  Because Ms. Beam had more than one criminal history point, she did not qualify for the safety valve at her August 2018 sentencing.  (*See* Doc. 159, p. 16, ¶ 73).

Today, Ms. Beam would qualify for the safety valve because she does not have more than 4 criminal history points, and she does not have a prior 3-point or 2-

point offense.  Therefore, if the Court were to sentence Ms. Beam today, her total offense level would decrease from 31 to 29, establishing a guideline sentencing range of 108-135 months.  With the safety valve and other considerations that prompted a sentence below the guideline range in August 2018, Ms. Beam's sentence likely would be well below 100 months.

Thus, Congress has decided that Ms. Beam should not face the stiff penalty that the Court imposed at sentencing.  Though the First Step Act does not apply retroactively to Ms. Beam, the Court considers the impact of the legislation in reviewing the sentencing factors at 3553(a).  In addition, the 3553(a) factor concerning the most effective way to provide medical treatment now favors a sentence modification.  18 U.S.C. § 3553(a)(2)(D).  COVID-19 has exacerbated the strain on an already-taxed prison health care system.[10]  As noted, if Ms. Beam were to require hospitalization for treatment, she would not be able to receive that treatment at FCI Aliceville or even in the community in which the BOP facility is

---

[10] *See* Andrew Brunsden, Comment, *Hepatitis C in Prisons: Evolving Toward Decency Through Adequate Medical Care and Public Health Reform*, 54 UCLA L. REV. 465, 507 (2006) ("[T]he rapid growth of prison populations, aging inmates, and rising health care costs . . . exert increasing pressure on prison health programs with limited resources to meet medical needs."); Evelyn Malavé, Note, *Prison Health Care After the Affordable Care Act: Envisioning an End to the Policy of Neglect*, 89 N.Y.U. L. REV. 700, 706 (2014) ("A lack of funding causes prisons to eliminate all but the most essential programs.  Mental health care in prisons is particularly abysmal: Many prisons have inadequately trained staff and tend to rely on mostly medication-based treatment -- rather than emphasizing therapy and counseling -- and the segregation of mentally ill prisoners . . . .").

located.   Between the inability to social distance in prison and the shortage of medical equipment and care near FCI Aliceville, Ms. Beam is in an extremely poor environment, given her underlying medical conditions and the increasing threat of COVID-19.  Because imprisonment compounds the risks of COVID-19, particularly for a vulnerable prisoner like Ms. Beam, the Court concludes that Ms. Beam's medical needs will be met in the "most effective manner" at home, where she can socially distance, practice personal hygiene, and where, if he contracts COVID-19, she can access the care she needs through local health care providers.

While Ms. Beam has served only 26 months of her sentence, further imprisonment is not necessary to deter future criminal conduct.  Before she was sentenced for her crime in this case, Ms. Beam had not spent a significant amount of time in jail or prison.  (Doc. 159, pp. 17–19).  The two years that she has lived in federal custody likely has had a significant deterrent impact.  She has no disciplinary record in prison.  Exhibit A.  In addition, Ms. Beam previously has been successful on probation, having completed five years of probation between 2006 and 2011 on state drug charges.  (Doc. 159, pp. 17–18).  And Ms. Beam will know that if she violates the conditions that will govern her lengthy term of supervision, she will return to prison.  Therefore, she is not likely to return to drug distribution, especially if she receives the drug treatment that she needs.

District courts across the country have granted motions for compassionate release from inmates who have served only a small portion of their term of imprisonment for drug-related crimes. *See, e.g.*, *United States v. Locke*, No. CR18-0132 RAJ, 2020 WL 3101016 (W.D. Wash. June 11, 2020) (granting compassionate release to inmate convicted of drug and gun offenses who served only "a few months" of his 62-month term of imprisonment); *United States v. Fowler*, 445 F. Supp. 3d 452, 453 (N.D. Cal. 2020) (granting compassionate release to inmate convicted of methamphetamine distribution after serving less than a year of her 60-month term of imprisonment); *United States v. Barber*, 466 F. Supp. 3d 1127, 1128 (D. Or. 2020) (granting compassionate release to inmate convicted of cocaine distribution after serving eight months of a 60-month term of imprisonment); *United States v. Delgado*, 457 F. Supp. 3d 85, 87 (D. Conn. 2020) (granting compassionate release to inmate convicted of cocaine distribution after serving 29 months of a 120-month term of imprisonment).  Ms. Beam's crime was serious, but her sentence, in a time of rapidly increasing rates of COVID-19, could become a death sentence. That is not an appropriate penalty for Ms. Beam's conduct.  Moreover, Ms. Beam is not being released from prison without significant restrictions on her liberty.

# V.

Accordingly, the Court reduces Ms. Beam's sentence of imprisonment to time served as of December 15, 2020 at 5:00 p.m.  Ms. Beam shall serve a special period of supervised release of 48 months pursuant to 18 U.S.C. § 3582(c)(1)(A)(i), followed by her original 120-month term of supervised release.

Upon release from FCI Aliceville, Ms. Beam shall self-quarantine at her approved residence for 10 days, except for necessary medical treatment and only upon prior notice and approval by the probation officer, except in a true emergency.  Upon completion of her quarantine, Ms. Beam shall be placed on location monitoring for a period of 10 months.  Ms. Beam must comply with all requirements of the location monitoring program and must pay for the cost of monitoring unless the probation office determines she does not have the ability to do so.  The form of location monitoring technology used to monitor her will be at the discretion of the probation officer.  Ms. Beam must have access to a telephone with video capabilities to allow her to communicate with her probation officer.  The standard conditions of supervised release of record in this Court and the special conditions imposed at the time of sentencing shall apply during Ms. Beam's special term of supervision.

**DONE** and **ORDERED** this December 11, 2020.

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE